IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SCOTTSDALE INSURANCE CO., A/S/O
Chris Chereny and Karly Chereny,

        Plaintiff,

v.                                            Case No. 14-1183-JTM

DEERE & COMPANY,

        Defendant.

**MEMORANDUM AND ORDER**

This case arises out of a fire that destroyed a combine manufactured by defendant Deere & Company ("Deere") and insured by plaintiff Scottsdale Insurance Co. ("Scottsdale"). Scottsdale, as subrogee of the insured combine owners, brought this action for breach of express warranty and breach of implied warranty of merchantability, alleging that a defect in the combine's Emissions Control System ("ECS") caused the fire. This matter is before the court on Deere's motion for summary judgment (Dkt. 49). Deere seeks summary judgment on Scottsdale's express and implied warranty claims, and further seeks exclusion of expert testimony by Raymond Thompson. As discussed below, the motion is granted in part and denied in part.

**I. Uncontroverted Facts**

**A. Background Facts**

Chris and Karly Chereny ("the insureds") operate a custom harvesting business. They have a combined 55 years of experience operating harvesting machines. On March

25, 2013, the insureds purchased two used 2012 model year John Deere S670 combines from a Kansas John Deere dealer. The dealer informed the insureds that the combines came with a warranty. They received a copy of the front page of their purchase order, which includes a section of text stating in all capital letters that the purchase excludes an implied warranty of merchantability.

The insureds allege they never received a copy of the Deere express warranty regarding the combines. Deere's standard express warranty ("the Deere warranty") states that it will repair or replace any covered part that is found to be defective in material or workmanship during the warranty term. The Deere warranty covers the combine's non-wear[1] components for a 12-month period from the date of purchase.

**B. The S670 Emissions Control System**

The S670 combine's ECS removes particulate matter from its engine exhaust. The system employs sensors and oxidizers, monitored and controlled by a computer, and a two-phase physical filtration system within the combine's exhaust system. Exhaust gas passes through the Diesel Oxidation Catalyst ("DOC"), which reduces carbon monoxide, hydrocarbons, and some particulate matter. Downstream of the DOC, exhaust gas is forced through porous channel walls of a Diesel Particulate Filter ("DPF"), trapping particulate matter therein. Particulate matter trapped in the DPF is oxidized through a continuous cleaning process called Passive Regeneration. Passive Regeneration does not create more heat than normal engine operations.

---

[1] The Deere warranty does not cover normal wear-and-tear items, such as tires or belts.

A computer controlling the ECS supplements Passive Regeneration with an automated Active Regeneration process on an as-needed basis. The need for Active Regeneration is determined through an analysis of exhaust temperature and pressure data collected by sensors. The computer alerts the driver that Active Regeneration is required. The operator can, under some circumstances, override the computer to delay the Active Regeneration process through the combine's Touch Screen Display. If the operator continues to override the Active Regeneration process, the computer will eventually force a Parked Regeneration process if it senses that the DPF is incapable of performing its function on a passive or automatic basis. Once the computer forces a Parked Regeneration, it limits the engine's output such that the combine is incapable of conducting harvesting functions.

**C. The Combine Fire**

During harvest operations on June 2, 2013, a fire occurred on or in one of the combines, destroying it. Mrs. Chereny was driving behind the combine at the time. She testifies that she observed flames shooting from the combine's exhaust before it caught fire.

## II. Expert Opinion Testimony

Scottsdale proffers the testimony of Raymond Thompson in the form of expert opinion testimony under FED. R. EVID. 702. Deere argues that Thompson's opinion testimony should be excluded because his report violates the disclosure requirements of Rule 26, or, alternatively, that Thompson is not qualified to testify as to alleged defects

3

in the combine's emissions system. As explained below, Thompson is qualified to testify about the origin of the fire, but not about a defect in the combine.

**A. Portions of Thompson's testimony are inadmissible under FRE 702.**

The judge must determine at the outset whether the expert testimony is admissible pursuant to FED. R. EVID. 104(a); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). "Federal Rule of Evidence 702 requires a district court to assess proffered expert testimony to ensure it is both relevant and reliable." *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012). The court must determine whether the expert is qualified to testify, then "whether the opinion is reliable by assessing the underlying reasoning and methodology." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc); *see* FED. R. EVID. 702.

    1. Thompson's qualifications

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . . ." FED. R. EVID. 702. An expert must testify within the reasonable confines of his subject area. *Ralston v. Smith & Nephew Richards, Inc.*, 965 F.3d 970 (10th Cir. 2001). A lack of specialization does not affect the admissibility of an expert's opinion, only its weight. *Id.*; *see also Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 665 (10th Cir. 2013) (unreported) (citing *Ralston*, 275 F.3d at 970) (affirming district court's rejection of expert testimony regarding defective tire design based on generalized experience as a tire failure investigator).

Thompson is a certified fire and explosion investigator and vehicle fire investigator. He previously worked as an automotive technician in a Volvo dealership.

4

Thompson has been employed at ProNet, an engineering forensic company, for ten years. (Dkt. 50-8, at 3). Thompson's training and experience qualify him to provide opinion testimony about the origin of the fire.

However, Thompson's area of expertise does not extend to complex diesel emissions control systems. Although he previously worked as an automotive technician, he did not work on DPF systems, combines, or with software systems similar to that used to control the S670's emissions and regeneration systems. Thompson is not an engineer and does not otherwise have training, education, or experience in designing or analyzing computer controlled turbo-diesel emissions systems utilizing DPFs. His specialized fire investigation training does not pertain to engine and emissions management software or hardware. Accordingly, Thompson's testimony is admissible only as to the origin of the fire, not whether a system or component failed or contained a defect in materials or workmanship.

2. Thompson's methods

An expert's opinion testimony must be based on sufficient facts or data and must be the product of reliable principles and methods applied to the facts of the case in a reliable manner. FED. R. EVID. 702. Experience and knowledge as a fire investigator may qualify one to deduce the likely source of a fire based on observation of physical evidence. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227 (10th Cir. 2004) (fire investigator offered expert testimony identifying a water heater as the source of an explosion accident; an engineer expert testified as to the particular defect in the water heater that caused the explosion).

5

Here, Thompson's opinion is based on his examination of the combine, his review of photographs of the combine, and interviews with the Cherneys. (Dkt. 55, at 228; Dkt. 50-9, at 1-2). He observed burn patterns and the extent of fire damage on the combine and determined that the fire began between the engine and the DPF. (Dkt. 55, at 241). Such methods, employed by a fire investigation expert, are sufficiently reliable for determining the fire's point of origin.

Accordingly, Thompson's testimony is admissible as to his opinion that the fire originated near the DPF. (Dkt. 50-9, at 2).

**B. Thompson's expert report violates Rule 26(a)(2).**

An expert witness who is retained or specially employed to provide expert testimony must provide a written report as part of Rule 26(a) initial disclosures. FED. R. CIV. P. 26(a)(2)(B). Such report must include:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony of the case.

FED. R. CIV. P. 26(a)(2)(B).

Thompson's report states his opinion that the fire "originated near the particulate filter." (Dkt. 50-9, at 2). His reasoning is based on observations of the fire damage. *Id*. However, his reasoning is not well explained; the report merely refers to the recorded

6

observations as its reasoning without explaining what about the observations led Thompson to conclude that the fire originated near the DPF.

According to the report, the only facts or data considered are Thompson's observations. Those observations are reported in four bullet points, noting only: (1) severe fire damage; (2) that two wheels were consumed and the remaining two wheels were partially consumed; (3) tremendous heat or fire damage in the engine compartment; and (4) that plastic, rubber, and some aluminum components were melted and consumed. (Dkt. 50-9, at 2). Thompson does not report any specific observations of burn patterns or specific components affected near the DPF that informed his conclusion. The reported facts and data underlying the opinion do not provide sufficiently detailed notice of the basis of Thompson's opinion under Rule 26.

Thompson's report does include photographs of the destroyed combine to be used as support for his opinions. The report also states Thompson's qualifications in the form of three certifications. It does not list any publications or other cases in which he has testified, nor does it report that no such publications or cases exist. The report similarly does not disclose the payment for the expert testimony.

Thompson's expert report does not satisfy Rule 26 because it patently fails to disclose matters of qualification and compensation and insufficiently explains Thompson's reasoning and facts and data on which the opinion is based.

**B. Thompson's report and testimony are not struck under Rule 37(c).**

A party who fails to provide information by disclosure or supplement under Rule 26(a) or (e) will not be permitted to use as evidence any witness information not so

disclosed unless the failure was "substantially justified" or harmless. FED. R. CIV. P. 37(c)(1). However, under Rule 37(c), the court may refuse to strike expert reports and allow expert testimony if the Rule 26(a) violation is justified or harmless. *Jacobson v. Deseret Book Co.*, 287 F.3d 936, 952-53 (10th Cir. 2002). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

<u>1. Scottsdale's Rule 37(c) violation was substantially justified or harmless.</u>

The court need not make explicit findings in determining whether the violation was justified or harmless, but should consider: (1) prejudice or surprise to the party against whom the testimony is offered, (2) the ability to cure such prejudice, (3) the extent to which such testimony would disrupt trial, and (4) bad faith or willfulness by the violating party. *Jacobson*, 287 F.3d at 953. The court finds no indication of bad faith or willfulness.

Scottsdale argues that Deere cannot be surprised by Thompson's trial testimony because he was deposed after the disclosure. A deposition cannot cure a Rule 26 disclosure defect; Rule 26(a)(2) serves to provide opposing counsel notice as to what an expert witness will testify, whether at trial or at a deposition. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). However, as in *Contra ClearOne Commc'ns, Inc. v. Biamp Sys.*, a deposition can cure *prejudice* – leading to the court's exercise of discretion under Rule 37(c) to refuse to strike the testimony. 653 F.3d 1163, 1177 (10th Cir. 2011)

8

("Biamp was able to cure some, if not all, of the prejudice it may have suffered" by deposing the opponent's expert).

Deere deposed Thompson on March 23, 2015. Upon review of the deposition, it is clear that Deere sufficiently probed the methods, underlying facts and processes, and reasoning on which Thompson's opinions are based. Further, the deposition likely revealed the full extent of Thompson's testimony. Thus, any prejudice suffered by Deere has been cured.

Thompson's testimony is unlikely to disrupt trial. Where an expert's testimony ventures into unknown waters, it is foreseeable that numerous objections or a break in examination to conference may result. However, Deere's deposition of Thompson unearthed the extent of his testimony and the facts, data, and processes relied upon in forming his opinions. Therefore, it is unlikely that Thompson will present testimony at trial that is not foreseeable by Deere.

Accordingly, the *Jacobson* factors indicate that Thompson's testimony should not be struck on grounds of the deficient expert report under Rules 26 and 37.

### III. Summary Judgment Legal Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is material if it "might affect the outcome of the suit . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An

issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party carries its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to show "that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324).

The non-moving party may not rely upon mere allegations or denials in its pleadings or briefs, but must present specific facts showing the presence of a genuine issue of material fact for trial. *Liberty Lobby*, 477 U.S. at 256. Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 249–50. The non-moving party must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court determines "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. "In making such a determination, the court should not weigh the evidence or credibility of witnesses." *Wells v. Wal-Mart Stores, Inc.*, 219 F. Supp. 2d 1197, 1200 (D. Kan. 2002). The court must

view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## IV. Analysis

**A. Deere is entitled to summary judgment on Scottsdale's implied warranty claim.**

Kansas law permits the exclusion of the implied warranty of merchantability by a writing that is conspicuous and mentions "merchantability." K.S.A. § 84-2-316(2). A "conspicuous" term is one "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." K.S.A. § 84-1-201(b)(10). A warranty exclusion written in all caps in the context of lowercase font is sufficiently "conspicuous." *See, e.g.*, *City of Winfield, Kan. v. Key Equip. & Supply Co.*, 2013 WL 557181 (D. Kan. Feb. 13, 2013) (unpublished).

Here, the purchase order for the combines features, immediately above the customer's signature line, a block of text written in plain font. (Dkt. 55, at 47). Within that text appears language of a limited warranty. Specifically, the text states – in contrasting all-caps font – "IMPORTANT WARRANTY NOTICE . . . IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS ARE NOT MADE AND ARE EXCLUDED UNLESS SPECIFICALLY PROVIDED IN THE JOHN DEERE WARRANTY." *Id.* The insureds received a photocopy of the purchase order from Deere. (Dkt. 55, at 45). The John Deere Express Warranty also contains contrasting all-caps language excluding any implied warranty of merchantability and fitness. (Dkt. 50-6).

11

Although the insureds argue that they never received the full text of the express warranty, it is undisputed that they received a copy of the front page of the purchase order, including the above exclusionary language. (Dkt. 55, at 14). The language of the purchase order writing is sufficiently conspicuous to exclude the implied warranty of merchantability. The writing unequivocally excludes any implied warranty unless specifically provided in the John Deere warranty. Had the insureds investigated the express warranty referenced in the purchase order (Dkt. 55, at 47), they would have discovered that it too excludes implied warranties. Therefore, any implied warranty of merchantability is excluded from the sale of the combine.

Accordingly, plaintiff cannot pursue a claim for breach of implied warranty; summary judgment in favor of Deere is proper on Scottsdale's breach of implied warranty claim.

**B. Summary judgment is not proper on Scottsdale's express warranty claim**.

<u>1. The Deere express warranty applies to the subject combine.</u>

An affirmation of fact or promise "made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." K.S.A. § 84-2-313(1). The existence and terms of an express warranty are questions of fact. *See Black v. Don Schmid Motor, Inc.*, 657 P.2d 517, 526-27 (Kan. 1983); *Golden v. Den-Mat Corp.*, 276 P.3d 773, 795 (Kan. App. Ct. 2012).

Scottsdale argues that the terms of the express warranty concerning the combine are in dispute because the insureds never received a copy of a written warranty. (Dkt.

12

55, at 5). It does not dispute that the combine was covered by *a* Deere warranty. *Id.* The insureds received only a photocopy of the front page of the purchase order for the combine. (Dkt. 55, at 45). Although the front of the purchase order contains the implied warranty exclusion, it does not contain the terms of an express warranty.

The purchase order does, however, reference "THE JOHN DEERE WARRANTY" that is printed on the back of the purchase order. (Dkt. 55, at 47). Deere argues that its standard warranty on agricultural equipment applies. The pretrial order indicates that the insureds entered into a contract to purchase the combine and "relied on the express warranty in [that] contract[]." (Dkt. 41, at 6). The pretrial order controls the action. FED. R. CIV. P. 16(d). Thus, the pretrial order's statement that the insureds relied on the express warranty in the contract – the purchase order included – indicates that the parties agree that the Deere warranty applies.

Further, the Deere express warranty covers defects in material or workmanship. Scottsdale continues to argue,[2] consistent with the pretrial order, that Deere breached the express warranty by selling a combine with a defect in material or workmanship. (Dkt. 55, at 37). Therefore, no genuine dispute of fact exists as to the terms or applicability of the express warranty. The Deere warranty's terms covering defects in materials or workmanship apply to the combine in question.

---

[2] Scottsdale continues to argue in the alternative that the Deere express warranty does not apply to the combine in question, thereby seeking to avoid exclusion of the implied warranty of merchantability.

13

<u>2. Summary judgment is not proper on Scottsdale's express warranty claim.</u>

A breach of express warranty claim is established by proving simply that the product did not perform as warranted or did not have the properties warranted. *Huebert v. Fed. Pac. Elec. Co.*, 494 P.2d 1210, 1214 (Kan. 1972); *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1468, 1476 (D. Kan. 1994).[3] A plaintiff need not prove that a specific defect existed in the product or that it existed when the product left the defendant's control. *Huebert*, 494 P.2d at 1215 (citing *Hansen v. Firestone Tire & Rubber Co.*, 276 F.2d 254 (6th Cir. 1960)). A breach of express warranty may be proved by direct or circumstantial evidence. *See Voelkel*, 846 F. Supp. at 1478.

Deere's express warranty states that it will "repair or replace any part covered under the warranties that are defective in material or workmanship." (Dkt. 55, at 38). Therefore, Scottsdale must prove that the combine suffered from a defect in material or workmanship to prevail on its breach of express warranty claim.

Deere argues that, without Thompson's testimony regarding a defect, Scottsdale cannot prove that a defect in materials or workmanship existed. Scottsdale argues that it has come forward with sufficient facts to survive summary judgment by producing

---

[3] Deere cites *Voelkel*, 846 F. Supp. at 1475-76, for the proposition that Scottsdale may establish a prima facie case with circumstantial evidence alone, but only by presenting expert testimony or evidence tending to negate other reasonable causes. (Dkt. 50, at 26). Deere thus argues that Scottsdale fails to establish a prima facie case because it does not present expert testimony tending to negate other reasonable causes. However, Deere's argument fails because the claims in *Voelkel* and the authority cited therein involved strict product liability. Under Kansas law, the economic loss doctrine bars actions in strict product liability where, as here, the harm or injury is limited to the product itself. *Koss Constr. v. Caterpillar, Inc.*, 960 P.2d 255, 260 (Kan. 1998). Scottsdale's claims therefore cannot include strict product liability and are limited to contract-based claims – and Scottsdale may establish a prima facie case without expert testimony tending to negate other reasonable causes.

evidence that the combine was shooting flames from the exhaust. Deere does not counter with evidence that flames shooting from the exhaust are a normal part of operation for an S670.

Deere argues that no defect existed, that no evidence supports a factual determination that any part of the combine's engine management or emissions system was defective, and that the fire was likely caused by crop debris accumulated on the combine over the course of a seven-hour day of harvesting. Deere's fire expert witness, Mike Senneff, opines that crop debris may have ignited the fire, not a defective DPF or DOC; however, he also states that the cause of the fire is undetermined. (Dkt. 55, at 322-23). Post-incident photographs show that the combine's DPF housing remains intact.

Deere's contentions of fact indicate that the fire was not caused by a component failure; Scottsdale's contentions of fact indicate that some emissions component ignited within combine's exhaust system, evidencing a defect. This factual dispute is material because it affects the determination of whether the combine suffered from defective materials or workmanship. The dispute is genuine because a reasonable juror might conclude that fire shooting from the combine's exhaust, together with a lack of definitive proof of other causes and an expert opinion that the fire originated near the DPF, is sufficient evidence to prove a defect.

IT IS ACCORDINGLY ORDERED this 14th day of July, 2015, that Deere's Motion (Dkt. 49) is GRANTED as to Scottsdale's implied warranty claim, but DENIED as to Scottsdale's express warranty claim. The admissibility of Thompson's testimony is limited as described herein.

s\J. Thomas Marten<br>
J. THOMAS MARTEN, CHIEF JUDGE